J-A20024-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ANTHONY J. SULPIZIO | : | |
| | : | |
| Appellant | : | No. 2886 EDA 2024 |

Appeal from the Judgment of Sentence Entered September 23, 2024
In the Court of Common Pleas of Northampton County Criminal Division
at No(s): CP-48-SA-0000136-2023

BEFORE: MURRAY, J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY McLAUGHLIN, J.:        **FILED DECEMBER 10, 2025**

Anthony J. Sulpizio appeals *pro se* from the judgment of sentence entered for his conviction for summary harassment.[1] We affirm.

This case stems from a private criminal complaint filed by Lynn Prior against Sulpizio for protesting outside her home on September 10, 2022. ***See*** Private Criminal Complaint, filed 10/3/22. The Commonwealth charged Sulpizio with harassment (engaging in a course of conduct or committing repeated acts with no legitimate purpose). ***See*** 18 Pa.C.S.A. § 2709(a)(3). Following a summary trial, a magisterial district judge found Sulpizio guilty. Sulpizio appealed to the Northampton County Court of Common Pleas for a trial *de novo*. ***See*** Notice of Appeal from Summary Conviction, filed 6/6/23.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2709(a)(3).

At trial in the Court of Common Pleas, the Commonwealth presented testimony from Prior and her husband, Dr. John Roizin, who is a physician. The court also heard testimony from Sulpizio and a second protester, John Dunkle.

Dr. Roizin testified that he and his wife are owners of the Allentown Women's Center ("Center"). N.T., Trial, 9/23/24, at 4, 5. The center provides women's health care, including abortion care. *Id.* Dr. Roizin is medical director at the center. *Id.* at 4.

Dr. Roizin explained that he knew Sulpizio as an antiabortion "protester who used to go to our clinic frequently as well as to my house." *Id.* at 5, 6. The Commonwealth asked Dr. Roizin if there was a time when the Center needed to construct a wall. *Id.* at 6-7. Defense counsel objected, stating:

> I would object to this, Your Honor. This case is about an incident that happened at this fellow's house, and any other testimony has not been given to us or any notice of other testimony about any other incidents at any other time at a place that was miles and miles away has nothing to do with this case.

*Id.* at 7.

The Commonwealth responded that "the charge is a course of conduct. This is going to go directly to [Sulpizio's] statements about his intention to come to the doctor's home." *Id.* The court overruled the objection. Dr. Roizin testified that in 2020 "to limit [Sulpizio's] access to patients and staff, we closed off the entrance – driveway entrance on Courtney Avenue and built a wall[.]" *Id.* at 8. He said that in response to the wall being built, Sulpizio said

"that he's going to now start coming to my house to harass or – or be there." *Id.*

After the construction of the wall, Sulpizio began showing up at Dr. Roizin's house "approximately once a week." *Id.* at 9. The Commonwealth asked Dr. Roizin if a court had ordered Sulpizio to be excluded from the Center. *Id.* Counsel objected, arguing that such information had "nothing to do with the case . . . This is just getting involved – bringing up other incidents that have nothing whatsoever to do with this." *Id.* He also added that "there was absolutely nothing provided in advance that this type of testimony is going to be given, no type of evidence that was provided, you know, to let us know about this[.]" *Id.* at 10. The court inquired whether defense counsel had requested discovery. *Id.* Counsel responded that he had not. The court overruled the objection.

Dr. Roizin then testified that in August 2021, "[Sulpizio] was ordered to not be able to come to our clinic anymore." *Id.* at 11. After that, Sulpizio began showing up at Dr. Roizin's house two to four times a week. *Id.* at 11-12. Dr. Roizin explained that Sulpizio would be outside of the home before Dr. Roizin left for work, which would range from 7:00 a.m. to 9:00 a.m., depending on the day of the week. *Id.* at 13-14. Sulpizio would "pace[] kind of the borders, the physical borders of [Dr. Roizin's] house, not the property but the house from the driveway – from one side of the house to the other." *Id.* at 14.

Sulpizio would appear at the house with signs with pictures of Dr. Roizin and his son's name written on them. *Id.* at 15. Sulpizio would also "pace from one end of the house to the other, stopping at each window and door[]," whistling loudly to get Dr. Roizin's attention, and waving. *Id.* at 15-16. When Dr. Roizin would leave to get in his vehicle in the driveway, Sulpizio would run up with his camera, attempting to record Dr. Roizin. *Id.* at 16. During these times he would come "[r]ight up to the window" and would be within a couple of feet of the vehicle. *Id.* Before Dr. Roizin would enter his vehicle, Sulpizio would yell at or speak to him. Sulpizio would also "position himself behind [the] car" causing Dr. Roizin to have to wait until Sulpizio moved from the driveway. *Id.* Dr. Roizin also explained that another man, John Dunkle, would protest with Sulpizio outside of the home. *Id.* at 18. However, Dunkle would stay on the street, sitting in a lawn chair with a sign. *Id.* at 19.

On September 10, 2022, Dr. Roizin called the police after his wife informed him that Sulpizio was outside of their home. *Id.* at 17-18. The police arrived, spoke with Sulpizio, and left. *Id.* at 18. Dr. Roizin called the police a second time, and an officer informed the couple that they could go to the magisterial district court to file charges. *Id.* at 27.

Dr. Roizin's wife, Lynn Prior, testified that Sulpizio would show up at their home "several times a week" after August 2021. *Id.* at 37. Sulpizio "would come in the mornings to try and catch when [Dr. Roizin] was leaving for work." *Id.* at 38. She explained that Sulpizio would "run up to us and yell at us" and "would position himself behind my car so that I had to back out of

the driveway slowly." *Id.* at 39. He would also "run up and put his face right in the driver's window and yell at [Prior]." *Id.* at 40. On other occasions, Sulpizio "would walk along the side of the house and stop at every window and door and whistle" and yell, "['H]ey, Johnny, hey Lynn,['] to let us know he was out there and just to intimidate us, taunt us to come out." *Id.* at 41.

On the day in question, while sitting on her back porch, Prior heard whistling that she recognized to be from Sulpizio. *Id.* at 43. When she looked up, she saw Sulpizio peering through hedges. *Id.* He then "kept walking along the hedge line and peering in wherever there was a gap in the bushes and whistling at [Prior]." *Id.* at 44. Prior went inside her home and told her husband that Sulpizio was outside. *Id.* While sitting in the living room, she looked out the window and saw Sulpizio waving at her from the street. *Id.* at 45. Prior moved to a different section of the home and again saw Sulpizio standing on the street and whistling. *Id.* at 46. Prior then asked her husband to call the police twice. When police arrived, they informed her that she could file a claim with the magistrate, which she did the following week. *Id.* at 48.

Sulpizio testified in his own defense that he had been to Dr. Roizin's home approximately 50 times. *Id.* at 68. On the day on which Dr. Roizin called the police, Sulpizio said he arrived at the property with John Dunkle to protest abortion. *Id.* at 69, 84. While holding a sign as well as a camera in his hand, Sulpizio walked past the Roizins' home. *Id.* at 77-78. He admitted that he waved in the direction of the home and whistled. *Id.* at 78. He explained that he whistled because "I understand through hearsay that John Roizin has a

- 5 -

firearm, and I didn't want him to be able to say that I was sneaking up or anything like that and use a firearm against me." *Id.* Sulpizio testified that five officers arrived and told him to stop whistling. *Id.* at 79. After the police left, he continued walking up and down the street. *Id.* at 79-80. He also testified that he saw Prior in her backyard but never peered through the hedges. *Id.* at 79-80, 82. He stated that he saw Prior through a fence in the backyard. *Id.* at 82. Sulpizio explained that he would try to get his sign close when the couple would get in their cars, "[u]sually not yelling" or blocking their ability to leave. *Id.* at 90.

Dunkle testified that on the day in question, he did not see Sulpizio peering into bushes or going onto the Roizins' property. *Id.* at 99.

The court found Sulpizio guilty of harassment and imposed 90 days of reporting probation and a fine of $300. It also ordered Sulpizio to stay at least 1000 feet away from the Roizin residence.

Sulpizio filed a *pro se* notice of appeal. Notice of Appeal, filed 11/5/24. In February 2025, Sulpizio filed in this Court an Application to Proceed *Pro Se*, stating that *pro bono* trial counsel could not continue to represent him due to time constraints and health issues. **See** Application to Proceed *Pro Se*, filed 2/3/25. The application included counsel's Praecipe to Withdraw Appearance, stating that he represented Sulpizio *pro bono* at the trial and that "he is unable to help [Sulpizio] in the matter" based on time restraints and health conditions. Upon consideration of the application, we permitted counsel to

withdraw, granted Sulpizio's request to proceed *pro se*, and deemed his *pro se* brief timely filed on February 3, 2025. Order, filed 3/4/25.

Sulpizio raises the following questions:

 I.  Did the Trial Judge err by allowing evidence of alleged prior bad conduct not contained in the four corners of the private criminal complaint and without prior written notice to [Sulpizio]?

 II.  Did Trial Judge fail to perceive that conduct by [Sulpizio] on a public street on 9/10/22 was lawful, did not fit the definition of harassment under §2709, and that [Sulpizio's] behavior was not "lewd, lascivious, threatening or obscene words, language, drawings, caricatures or actions" defined under §2709(f) "definitions" for "course of conduct?"

 III. Did the Trial Judge fail to perceive that all conduct by [Sulpizio] on the day in question or prior thereto was peaceful protest on a public street protected by the First Amendment and, as peaceful protest, had "legitimate purpose?"

 IV. Did Trial Judge exhibit bias against [Sulpizio] by "coaching" and prompting Prosecutor through his Closing Arguments with questions about previous alleged actions that were not alleged to have happened on the day in question?

Sulpizio's Br. at 6-7.

We do not address Sulpizio's second and fourth issues. He did not include them in his Rule 1925(b) statement. **See** Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived"). We now turn to the merits of his remaining claims.

In his first issue, Sulpizio claims that the court erroneously allowed prior bad acts evidence about his conduct at the clinic and the stay-away order despite the Commonwealth's failure to give notice of its intent to admit bad acts evidence pursuant to Pa.R.E. 404(b)(3). The trial court and the Commonwealth maintain that this issue is waived because Sulpizio did not object to the testimony based on a violation of Rule 404(b)(3).

We decline to find waiver. To preserve a claim of error for the admission or exclusion of evidence, a party must make "a timely objection, . . . and state[] the specific ground, **unless it is apparent from the context**[.]" Pa.R.E. 103(a)(1) (emphasis added). Here, it is apparent from counsel's statements when he objected that he was challenging the lack of Rule 404(b)(3) notice. Counsel complained of a lack of "any notice of other testimony about any other incidents at any other time[.]" N.T., Trial at 7. Counsel also said, "there was absolutely nothing provided in advance that this type of testimony is going to be given, no type of evidence that was provided, you know, to let us know about this[.]" *Id.* at 10. This was sufficient to preserve the Rule 404(b)(3) claim.

The admission of evidence is within the trial court's discretion. ***Commonwealth v. Schofield***, 312 A.3d 921, 925 (Pa.Super. 2024), *appeal denied*, 327 A.3d 184 (Pa. 2024). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the

record, discretion is abused." *Id.* (citation omitted). "In order to find that the trial court's evidentiary rulings constituted reversible error, such rulings must not only have been erroneous but must also have been harmful to the complaining party." *Oxford Presbyterian Church v. Weil-McLain Co.*, 815 A.2d 1094, 1100 (Pa.Super. 2003) (citation omitted).

Rule 404(b)(3) requires the prosecution in a criminal case to "provide reasonable written notice in advance of trial" of its intention to admit evidence of prior bad acts "so that the defendant has a fair opportunity to meet it." The court may excuse the failure to give pretrial notice for "good cause":

> *Notice in a Criminal Case*. In a criminal case the prosecutor must provide reasonable written notice in advance of trial so that the defendant has a fair opportunity to meet it, or during trial if the court excuses pretrial notice on good cause shown, of the specific nature, permitted use, and reasoning for the use of any such evidence the prosecutor intends to introduce at trial.

Pa.R.E. 404(b)(3).

Evidence of prior bad acts is admissible only when offered for a proper purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* at 404(b)(2). The evidence's probative value must outweigh the potential for unfair prejudice. *Id.*

Here, it appears that the prosecution did not give reasonable written notice in advance of trial of its intention to admit evidence of these prior acts. However, we do not reverse because Sulpizio has not explained any way in which he would have prepared for trial differently if the Commonwealth had

- 9 -

given notice. "[T]o find that the trial court's evidentiary rulings constituted reversible error, such rulings must not only have been erroneous but must also have been harmful to the complaining party." **Hagans v. Hosp. of the Univ. of Pa.**, 343 A.3d 251, 271 (Pa.Super. 2025) (quoting **Oxford Presbyterian Church**, 815 A.2d at 1100). Sulpizio has failed to show how the ruling was harmful to him. We therefore do not find an abuse of discretion.

Next, Sulpizio maintains that since his speech did not amount to something that would inflict injury or incite an immediate breach of the peace, his message was protected by the First Amendment. He also claims he had a legitimate purpose to protest on the day in question.

A challenge to the constitutionality of a criminal statute is "a pure question of law for which our standard of review is *de novo*, and our scope of review is plenary." **Commonwealth v. Collins**, 286 A.3d 767, 775 (Pa.Super. 2022). "[A] defendant may contest the constitutionality of a statute on its face or as-applied." **Commonwealth v. Bradley**, 232 A.3d 747, 756-57 (Pa.Super. 2020) (citation omitted). Sulpizio mounts an as-applied attack. "An as-applied attack . . . does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." **Id.** (citation omitted). We cannot find a statute unconstitutional "unless it clearly, palpably, and plainly violates the Constitution. If there is any doubt that a challenger has failed to reach this high burden, then that doubt must be resolved in favor of finding

the statute constitutional." ***Pa. State Ass'n of Jury Comm'rs v. Commonwealth***, 64 A.3d 611, 618 (Pa. 2013) (citation omitted).

Here, the trial court determined that Sulpizio's conduct was not protected by the First Amendment and did not serve a legitimate purpose.

> The record demonstrates that Sulpizio's conduct was intended to be harassing and annoying to Dr. Roizin and Prior. For example, like in [***Commonwealth v.***] ***Collins***[, 286 A.3d 767 (Pa.Super. 2022)], Sulpizio's intent was to "get back" at Dr. Roizin after the wall was constructed at the Women's Center. Dr. Roizin testified that, "A month or two prior to the wall going up, [Sulpizio] heard that it was going up, and he yelled at me saying, hey, Johnny, I know what you're doing and I'm going to take it personally." N.T. Sept. 23 at 8. Dr. Roizin further testified that after the wall was constructed at the Women's Center, "[Sulpizio] announced that he's going to now start coming to my house to harass or – or be there." ***Id.*** at 8.

> Moreover, we find that Sulpizio's actions were not intended to portray a message to the general public regarding abortion. Sulpizio's conduct of: 1) whistling at Prior; 2) peering through the hedges at Dr. Roizin's and Prior's home; 3) following and watching Prior from inside of her home; and 4) waving at Prior, did not contain an educational or symbolic message regarding abortion. Rather, the record establishes Sulpizio's intention was to shame and provoke Dr. Roizin and Prior.

> \*\*\*

> Here, while we are cognizant that Sulpizio may have a legitimate interest in protesting abortion, we find that Sulpizio's actions on the date of the incident served no legitimate purpose. Considering Sulpizio's conduct on the date of the incident when he: 1) whistled at Prior; 2) peered through the hedges at Dr. Roizin's and Prior's home; 3) followed and watched Prior from inside of her home; and 4) waved at Prior, we cannot say that Sulpizio's actions served any legitimate purpose.

- 11 -

Pa.R.A.P. 1925(a) Opinion, filed, 12/12/24, at 36, 37-38 (some citations omitted).

The trial court properly rejected Sulpizio's First Amendment challenge. Not all speech is constitutionally protected. **See Collins**, 286 A.3d at 776 (citing **Chaplinsky v. New Hampshire**, 315 U.S. 568, 571-72 (1942)). Classes of speech such as "the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words – those which by their very utterance inflict injury or tend to incite an immediate breach of the peace" do not "raise any Constitutional problem." **Id.** (quoting **Chaplinsky**, 315 U.S. at 571-72).

The **Chaplinsky** list is not exhaustive and unprotected speech includes that which constitutes harassing conduct. "[O]ur Supreme Court has upheld a criminal statute prohibiting harassment by unwanted, repeated communications in the face of a First Amendment challenge, noting that the state has a legitimate interest in preventing harassment and that the offense was directed at the harassing conduct rather than the speech itself." **Collins**, 286 A.3d at 776 (citing **Commonwealth v. Hendrickson**, 724 A.2d 315, 318 (Pa. 1999)).[2] Section 2709 by its terms reaches only conduct that serves no legitimate purpose, which is conduct that is not "lawful or constitutionally protected." **Commonwealth v. Coniker**, 290 A.3d 725, 738, 741 (Pa.Super.

_____

[2] **See Hendrickson**, 724 A.2d at 318 (rejecting overbreadth challenge to prior harassment statute against a free-speech overbreadth challenge, finding that "the statute focuses on the manner and means of communication and proscribes communications made with an intent to harass" and was not "directed at the content of speech and . . . unrelated to the suppression of free expression").

2023) (citation omitted). It does not apply to "any conduct that directly furthers some legitimate desire or objective of the actor." *Id.* at 738 (citation omitted).

Here, Sulpizio's acts were not constitutionally protected, and as such, there was no violation of his constitutional rights. Sulpizio was not convicted and punished because of the content of his speech but because of the nature of his conduct. Sulpizio's whistling, peering through hedges, waving, and watching Prior in her home amounted to harassing conduct that served no legitimate purpose. We therefore affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/10/2025